1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CYNTHIA L. BOREN,

               Plaintiff,

    v.

JO ANNE B. BARNHART, Commissioner of
Social Security,

               Defendant.

CASE NO.    C04-5182FDB

REPORT AND
RECOMMENDATION

Noted for April 15, 2005

Plaintiff, Cynthia L. Boren, has brought this matter for judicial review of the denial of her applications for disability insurance and supplemental security income ("SSI") benefits.  This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the following report and recommendation for the Honorable Franklin D. Burgess' review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born on November 3, 1956. Tr. 53.  She has a high school education and training in computer programming. Tr. 83.  She has past work experience as a machine operator, shift supervisor,

1    plastics assembler, cashier, and cleaning supervisor. Tr. 19, 68, 78.

2           On January 26 1998, plaintiff filed applications for disability insurance and SSI benefits, alleging

3    disability as of March 1, 1995, due to residuals from a right hip and pelvis injury and daily pain. Tr. 29.

4    Both applications were denied initially and on reconsideration. Id.  A hearing was convened on July 1, 1999,

5    before an administrative law judge ("ALJ"), but was postponed at the request of plaintiff for her to obtain

6    an attorney. Id.

7           The hearing was re-convened on November 17, 1999, at which plaintiff, represented by a non-

8    attorney, appeared and testified, as did a vocational expert. Id.  On February 25, 2000, the ALJ issued a

9    decision finding plaintiff not disabled, because she was capable of performing other jobs existing in

10   significant numbers in the national economy. Tr. 34-36.  On June 16, 2001, plaintiff's request for review of

11   the ALJ's decision was denied by Appeals Council. Tr. 18.

12          In the meantime, plaintiff filed new applications for disability insurance and SSI benefits in

13   November and December 2000, respectively, alleging disability as of August 1, 1995, due to back pain, hip

14   pain and heart disease. Tr. 17, 53, 77.  Both applications were denied initially and on reconsideration. Tr.

15   17, 37-42, 45-47.  On April 17, 2003, another hearing was held before a different ALJ, at which, plaintiff,

16   represented by counsel, appeared and testified, as did a vocational expert. Tr. 367-408.

17          On August 13, 2003, the second ALJ declined to re-open the prior ALJ's decision, finding plaintiff

18   to be not entitled to disability insurance benefits due to the *res judicata* effect of the prior ALJ's decision.

19   Tr. 18-19, 24.  The ALJ also determined that plaintiff was disabled as of October 9, 2002, with respect to

20   her SSI application, but not prior thereto, finding specifically in relevant part as follows:

21          (1)    at step one of the disability evaluation process, plaintiff had not engaged in
                   substantial gainful activity;
22
23          (2)    at step two, plaintiff had a "severe" impairment consisting of cardiomyopathy,
                   mild osteopenia and degenerative changes in the hips, and degenerative disc
                   disease of the lumbar spine status post surgery;
24
25          (3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of
                   those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;
26          (4)    at step four, prior to October 9, 2002, plaintiff had the residual functional
                   capacity to perform the exertional demands of sedentary work, but was unable to
27                 perform her past relevant work; and
28          (5)    at step five, prior to October 9, 2002, plaintiff was capable of performing other
                   jobs existing in significant numbers in the national economy.

Tr. 18, 23-24. Plaintiff's request for review was denied by Appeals Council on March 16, 2004, making the second ALJ's decision the Commissioner's final decision. Tr. 8-10. 20 C.F.R. §§ 404.981, 416.1481.

On March 30, 2004, plaintiff filed a complaint with this court seeking judicial review of the second ALJ's decision. (Dkt. #1). Plaintiff argues that decision should be reversed and remanded for an award of benefits for the following reasons:

(a)     the second ALJ improperly decided not to re-open the prior ALJ's decision

(b)     the second ALJ improperly disregarded the opinion of Dr. W. Brian Kirkham, plaintiff's treating physician;

(c)     the second ALJ erred in assessing plaintiff's credibility; and

(d)     the second ALJ posed an improper hypothetical question to the vocational expert.

For the reasons set forth below, the undersigned recommends the second ALJ's decision be reversed and remanded for further administrative proceedings.

## DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.     The ALJ Properly Declined to Reopen the Prior ALJ's Decision

The doctrine of *res judicata* "should not be rigidly applied in administrative proceedings." Lester v. Chater, 81 F.3d 821, 827 (9th Cir. 1996); Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988) (*res judicata* applied less rigidly to administrative proceedings than to judicial proceedings). While administrative *res judicata* also should not be "applied so as to 'contravene an overriding public policy or result in manifest injustice,'" it is only "[w]here the record is patently inadequate to support the findings the ALJ made," that

1    its application will be "tantamount to a denial of due process." Krumpelman v. Heckler, 767 F.2d 586, 588

2    (9th Cir. 1985) (quoting Thompson v. Schweiker, 665 F.2d 936, 940-41 (9th Cir. 1982)).

3            The Commissioner thus may apply administrative *res judicata* "to bar reconsideration of a period

4    with respect to which she has already made a determination, by declining to reopen the prior application."

5    Lester, 81 F.3d at 827.  In general, the Commissioner's refusal to reopen a decision regarding an earlier

6    period "is not subject to judicial review." Id.  This is because, once an administrative decision becomes final,

7    the Commissioner's decision to reopen a disability claim is "purely discretionary." Taylor v. Heckler, 765

8    F.2d 872, 877 (9th Cir. 1985).  In addition, because a discretionary decisions is not a "final decision" within

9    the meaning of 42 U.S.C. § 405(g), the Commissioner's refusal to reopen that decision "is not a 'final'

10   decision subject to judicial review." Id. (citations omitted).

11           The exception to the above rule is "where the Commissioner considers 'on the merits' the issue of

12   the claimant's disability during the already-adjudicated period." Lester, 81 F.3d at 827; Lewis v. Apfel, 236

13   F.3d 503, 510 (9th Cir. 2001).  If "such a *de facto* reopening occurs, the Commissioner's decision as to the

14   prior period is subject to judicial review." Lester, 81 F.3d at 827.  However, "where the discussion of the

15   merits is followed by a specific conclusion that the claim is denied on res judicata grounds, the decision

16   should not be interpreted as re-opening the claim and is therefore not reviewable." Krumpelman, 767 F.2d

17   at 589 (citing McGowen v. Harris, 666 F.2d 60, 68 (4th Cir. 1981)).

18           Here, the second ALJ declined to re-open the prior ALJ's decision, and thus applied administrative

19   *res judicata* to that decision, stating in relevant part:

20           My review of the evidence relied on in the prior decision does not confirm any legal
             error on its face or any other basis for the extraordinary step of reversing the prior
21           decision. . . . I conclude that there continues to be a lack of corroborating objective
             medical evidence to support any reopening of the prior decision.
22
23           Res judicata is present as the claimant had a previous determination or decision about
             her rights on the same facts and on the same issue or issues, and this previous
             determination or decision became final by either administrative or judicial action . . .
24           Accordingly, the claimant is precluded in this case from alleging disability on or before
             February 25, 2000, and is ineligible for Title II payments.
25
26   Tr. 18-19.  Although the second ALJ also later referred to some of the evidence in the record that pre-dated

27   the prior ALJ's decision (Tr. 19-20), this was in the context of determining whether plaintiff was disabled

28   subsequent to the date of that decision.  In any event, because the second ALJ expressly declined to re-open

     the prior ALJ's decision, her refusal to do so is not subject to judicial review.

Plaintiff argues, however, that the application of *res judicata* to the prior ALJ's decision would be manifestly unjust, because she was led to believe that by filing her second application, the Commissioner would again address all of the issues in her first application.  Specifically, plaintiff asserts that:

(1)   the Commissioner considered the same information in reviewing her second application that was submitted for her first application;

(2)   the initial consideration notice for her second application did not indicate that the Commissioner would not consider certain time periods because of the prior ALJ's decision;

(3)   the reconsideration decision notice for the second application did not state that plaintiff would be prejudiced by not appealing the Appeals Council's decision to deny her request for review of the prior ALJ's decision;

(4)   the hearing notice for the second application stated that she should be prepared to prove she was under a disability on or before September 30, 1998, suggesting that she was going to be afforded the opportunity to prove she was disabled prior thereto; and

(5)   she relied on the above notifications (none of which warned her of any adverse consequences in failing to pursue her first application) in believing she would be afforded the opportunity to prove her eligibility for disability insurance benefits.

Plaintiff thus appears to be arguing that because she had no warning that the filing of a second application might prejudice her ability to pursue the issues she raised in her first claim or hurt her chances of receiving disability benefits, she should not be prevented from having her prior claim be re-opened.

Plaintiff's argument, however, is without merit.  The initial and reconsideration denial notice forms that were sent to plaintiff concerning her second application both clearly warn about the risk of filing a new application versus appealing the Commissioner's decision.  The initial denial notice that plaintiff was sent, for example, reads in relevant part:

NEW APPLICATION

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with the decision and you file a new application instead of appealing:

○   you might lose some benefits, or not qualify for any benefits, and

○   we could deny the new application using this decision, if the facts and issues are the same.

So, if you disagree with this decision, you should ask for an appeal within 60 days.

Tr. 41 (emphasis added).  The reconsideration notice plaintiff received regarding her second application contains essentially the same warning, and further states that if she has any questions about her claim, she

"should get in touch with any Social Security Office." Tr. 46.  Thus, contrary to plaintiff's assertion, and even though she apparently was not represented by counsel until after she filed her second application, she received two clear warnings concerning the risks of filing a second application in lieu of appealing her first claim.  The fact that she chose to pursue both avenues is irrelevant.  If she had any questions about which was the proper course to take, or whether there would be a problem in filing versus appealing, she should have contacted her local, or any, Social Security Office as she was encouraged to do.[1]

Plaintiff also argues that application of administrative *res judicata* to her case would be a manifest injustice, because the prior ALJ failed to fully develop the record.  As discussed above, however, because the second ALJ properly declined to re-open the prior ALJ's decision, which was the Commissioner's final agency decision, the court is without authority to review the second ALJ's refusal to do so.  Further, there is no indication, as discussed below, that the medical evidence in the record is "patently inadequate" to support the second ALJ's determination on this issue.  Nor, absent a finding that such a determination was erroneous, does the court have the power to review the adequacy of the prior ALJ's decision, since that is not the final agency decision for which judicial review has been sought in this case.

Finally, plaintiff argues that if *res judicata* does apply to the prior ALJ's decision, there should be no presumption of continuing non-disability because of changed circumstances.  The Commissioner's "authority to apply res judicata to the period subsequent to a prior determination is much more limited." Lester, 81 F.3d at 821.  An ALJ's finding of non-disability creates a presumption the claimant was able to continue to work after the date of the ALJ's decision. Id.  That presumption will not apply, however, if there are "changed circumstances," such as "[a]n increase in the severity of the claimant's impairment." Id. Plaintiff asserts that the "changed circumstances" in this case are the MRI results that became available on October 9, 2002, which showed marked degenerative disease and nerve root impingement. Tr. 220.  This is precisely the date, however, after which the second ALJ determined that plaintiff had shown a worsening in her symptoms, and thus became disabled. Tr. 19, 23-24.  Accordingly, this issue is moot.

II.    Plaintiff Has Failed to Establish She Is Entitled to Disability Insurance Benefits

To be entitled to disability insurance benefits, plaintiff "must establish that her disability existed on

---

[1]In addition, the issue of the reconsideration notice's lack of warning about the risks of not appealing the Appeals Council's denial of request for review of her first application is irrelevant, as by the time her request for review had been denied, she already had filed her second applications despite the clear warnings she received about the risks of doing so.

REPORT AND RECOMMENDATION
Page - 6

1    or before" the date her insured status expired. Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998); see also

2    Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1460 (9th Cir. 1995) (social security

3    statutory scheme requires disability to be continuously disabling from time of onset during insured status to

4    time of application for benefits, if individual applies for benefits for current disability after expiration of

5    insured status). Plaintiff's date last insured was September 30, 1998. Tr. 17.  Thus, she will not be found

6    disabled, and will not be entitled to disability insurance benefits, if she fails to establish she was disabled

7    prior to or as of September 30, 1998. Tidwell, 161 F.3d at 601.

8        Because, as discussed above, the second ALJ did not err in declining to re-open the prior ALJ's

9    decision, he also did not err in precluding plaintiff from alleging disability on or before February 25, 2000,

10   the date of the prior ALJ's decision, as that decision constituted the Commissioner's final agency decision.

11   Tr. 19. Thus, because plaintiff's date last insured was September 30, 1998, she cannot establish that she is

12   entitled to disability insurance benefits, although, for the reasons set forth below, on remand she still may be

13   able to show that she is entitled to SSI benefits.

14   III.    The ALJ Properly Evaluated the Opinion of Dr. Kirkham

15       The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

16   medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the

17   record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the

18   ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, therefore, "the ALJ's

19   conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595,

20   601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in

21   fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical

22   experts "falls within this responsibility." Id. at 603.

23       In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

24   supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

25   detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

26   thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence."

27   Sample, 694 F.2d at 642.  Further, the court itself may draw "specific and legitimate inferences from the

28   ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

1    The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

2    either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

3    treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

4    legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the

5    ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739

6    F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain

7    why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07

8    (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

9    In general, more weight is given to a treating physician's opinion than to the opinions of those who

10   do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

11   a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings."

12   Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th

13   Cir. 2001); Magallanes, 881 F.2d at 75.  An examining physician's opinion is "entitled to greater weight

14   than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A nonexamining physician's

15   opinion may constitute substantial evidence if "it is consistent with other independent evidence in the

16   record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

17   Plaintiff argues the ALJ improperly disregarded and mischaracterized the opinion of Dr. Kirkham,

18   her treating physician.  In April 2003, Dr. Kirkham wrote a letter to plaintiff's attorney, in which he opined

19   as follows:

20   I am quite convinced reading the notes of both Dr. Vangerpen [sic] and Dr. Bagby [two
     of plaintiff's examining physicians] that Mrs. Boren was disabled and unable to pursue

21   any type of work whatsoever as far back as the initial contact with Dr. Vangerpen [sic]
     in April of 1998 and probably prior to that, although it is difficult to truly give you an

22   accurate statement concerning this.

23   Again, I reiterate that I am quite convinced that she was disabled as far back as April of
     1998, given that the initial notes/consultation that you forwarded to me are from Dr.

24   Vangerpen [sic].

25   Tr. 326-27.  With respect to Dr. Kirkham's opinion, the ALJ found as follows:

26   [T]he statement submitted by W. Brian Kirkham, M.D. does not offer a strong basis for
     speculating on the nature of disability back to the alleged onset date of 1995 (Exhibit

27   B20F).  He is a family practice doctor, and relies heavily in his letter on the consultative
     examination findings of Dr. Vangerpen [sic] (Exhibit B1F).  Yet, Dr. Vangerpen [sic]

28   relied on the claimant's subjective reporting of symptoms and had no medical records
     for review.

REPORT AND RECOMMENDATION
Page - 8

Tr. 18.  The undersigned finds the ALJ's findings to be well-supported by the objective medical evidence in the record.  First, it is the ALJ's, and not plaintiff's treating physician's responsibility to evaluate all of the medical evidence in the record. Reddick, 157 F.3d at 722; Sample, 694 F.2d at 642.  Thus, the ALJ has the duty to determine whether or not the opinions of Dr. Van Gerpen and Dr. Bagby ultimately support a finding of disability, not Dr. Kirkham.  Second, as discussed below, the ALJ properly discounted plaintiff's credibility.  See Tonapetyan, 242 F.3d at 1149 (ALJ may disregard medical opinion premised on claimant's complaints where record supports ALJ in discounting claimant's credibility); Morgan, 169 F.3d at 601; (physician's opinion premised to large extent on claimant's complaints may be disregarded where those complaints have been properly discounted).  He therefore did not err in discrediting Dr. Kirkham's opinion in part because of his reliance on Dr. Van Gerpen's opinion.

    A.    Dr. Kirkham's Opinion Was Not Unchallenged

For her part, plaintiff first asserts that Dr. Kirkham's opinion that she has been disabled and unable to engage in gainful work activity due to her physical disabilities since April 1998, is unchallenged in the record.  A review of the objective evidence from other medical sources in the record for the period prior to October 9, 2002, however, shows otherwise.

In a March 1998 telephone report, Dr. Royce F. Van Gerpen stated that plaintiff indicated her main problem was right hip pain. Tr. 107.  On examination, plaintiff walked without a limp, and her balance and coordination were "very appropriate." Tr. 108.  While her right hip abduction was diminished and painful compared to the left, and she reported being unable to perform a deep knee bend, she was able to stand and bear weight on her right hip.  Id.  She also had "excellent range of motion of her lower back," and "[t]here was no evidence of significant swelling or edema" in her lower extremities.  Id.  Dr. Van Gerpen diagnosed her with right hip pain of undefined etiology, and told her that "at some point" she may wish to confer with an orthopedic surgeon, and that also "at some point," a right hip MRI might be appropriate. Tr. 109.

In August 1999, Dr. George W. Bagby found plaintiff in no acute distress, noting that she was able to perform "near normally" on her feet and could walk on her toes and heels satisfactorily. Tr. 112.  She complained of right buttock pain after doing a half knee bend, but was able to stand and hop on one foot at a time normally. Tr. 113.  Tandem walking also was normal, straight leg raising was negative, and she had full strength in her lower extremities.  Id.  While plaintiff had some hypaesthesia in her right leg and foot, her

leg signs were normal in the reclining position. Id.  Although she had right sciatic notch tenderness, her gluteus maximus muscles were normal as well. Id.  Dr. Bagby further noted that x-rays of plaintiff's hips, pelvic bones, and sacroiliac joints showed no evidence of pathology, and that they indicated "[m]inimal" degenerative changes in her lumbar spine. Tr. 113, 120.

Dr. Bagby diagnosed plaintiff with "mild degenerative changes" in her low back and lumbar spine, "[s]ubjective evidence" of right leg nerve root involvement, and "normal" hip joints. Tr. 113.  He opined that her physical findings and x-rays essentially ruled out hip joint pathology, and that her symptomatoloy and findings were "more consistent with a lumbar disc protrusion." Tr. 114.  He felt that an MRI of her lumbar spine was needed "to more accurately evaluate" that possibility, and apparently to answer certain questions posed on a medical assessment of ability to do work-related activities form with which he was provided. Tr. 114, 115-16, 119.

Plaintiff told Mark Patterson, a physician's assistant, in July 2000, that she had been having hip and buttock pain "off and on for many years," with the hip being the worst problem. Tr. 146.   While plaintiff limped and showed some stiffness, she was not in acute distress. Id.  Examination of her right hip showed full extension and flexion, as well as normal internal/external rotation and abduction/adduction. Id.  She had "marked tenderness" in her lower right extremity, but had normal knee and ankle reflexes, with normal great toe extensor/flexor strength, and essentially negative straight leg raising. Tr. 146-47.

Although she had "quite a bit" of tenderness over her sacroiliac joint and buttock, plaintiff did not have any tenderness over the lumbar spine itself. Tr. 147.  X-rays of her hips and pelvis were normal. Tr. 147, 152.  While x-rays of plaintiff's lumbar spine showed "some mild degenerative changes," she had "no marked narrowing of the joints." Tr. 147, 153.  Mr. Patterson diagnosed plaintiff with sacroiliitis and right hip bursitis. Tr. 147.  She got "reasonably good relief" from a right hip injection. Id.

Mr. Patterson reported in August 2000, that plaintiff seemed to be doing at least somewhat better as the result of another hip injection, pain medication and physical therapy. Tr. 148.  Plaintiff's hip was "not bothering her near as much," and she was "able to sleep better throughout the night." Id.  Further, while she still had "aching and pain with walking," she was "able to walk better now." Id.  On examination, she had "minimal" tenderness, and good extension, flexion, abduction, and adduction in her right hip. Id.  Straight leg raising was negative, and she had normal reflexes. Id.  While plaintiff still had a lot of tenderness over

the right sacroiliac joint and buttock, there was "no tenderness over the back itself." Id.

In September 20, 2000, plaintiff told Mr. Patterson that she was "doing somewhat better." Tr. 149. She thought that physical therapy was helping her. Id. She had mild to moderate right back muscle spasm, but no tenderness over the sacroiliac joint, and "minimal" tenderness over her right hip. Id. While she had positive straight leg raising signs on the right, her knee and ankle reflexes were normal bilaterally. Id. X-rays of her lumbar spine also were normal. Tr. 149, 154. Mr. Patterson diagnosed plaintiff with low back strain. Tr. 149. In December 2000, Mr. Patterson expressed his belief that an MRI of her back needed to be done. Tr. 150. However, although plaintiff had some pain with right hip rotation on examination, she had full flexion and extension, and no pain with abduction or adduction. Id.

A physical residual functional capacity assessment form was completed in February 2001, by a non-physician. Plaintiff was found capable of lifting and/or carrying 10 pounds occasionally and 10 pounds frequently, standing and/or walking for at least 2 hours in an 8-hour workday, and sitting about 6 hours in an 8-hour workday. Tr. 122. She was unlimited in her ability to push and/or pull. Id. Plaintiff could climb, balance, stoop, kneel, crouch and crawl occasionally. Tr. 123-24.

Another physical residual functional capacity assessment form was completed by a non-examining physician, Dr. Morris E. Fuller, in August 2001. Dr. Fuller's findings were essentially the same as those found by the non-physican in February 2001, except that this time plaintiff was deemed capable of lifting less than 10 pounds frequently. Tr. 178-80. Her allegation of being able to carry a maximum of 5 pounds, however, was not considered consistent with the "minimal degree of osteoarthrits" noted on her x-rays and the lack of ongoing orthopedic treatment. Tr. 182.

In March 2002, Dr. Stuart O'Byrne found plaintiff had mild osteopenia, but otherwise "[m]inimal" degenerative changes in her right hip. Tr. 227. In April 2002, plaintiff was assessed with "[l]eft foot pain, secondary to trauma," but otherwise was in no acute distress. Tr. 228. In September 2002, she was noted to have a significant angulation of her spine to the left, and was diagnosed with degenerative joint disease, and "possible" muscle spasm. Tr. 251.

Dr. Robert A. Stier, a non-examining physician, answered a set of interrogatories in July 2002. He stated that plaintiff's "major medical complaints" were "not explained by the objective findings," although he felt that there were possible disorders that could explain them. Tr. 185-86. While Dr. Stier also felt a

lumbar spine MRI was required to evaluate plaintiff for disk herniation, spinal stenosis and possible nerve root compression and impingement, he noted the state had repeatedly refused to authorize one, most likely because "the objective findings of physical impairment and the routine lumbar spine x-rays" did "not show enough abnormalities to warrant the expense of a[n] MRI." Tr. 186.  Although Dr. Stier thought that the "radicular nature" of plaintiff's pain suggested nerve root compression due to disk protrusion, he admitted that chances were "good" that "no significant abnormalities" would be found by an MRI. Id.

Dr. Stier did not feel plaintiff met any of the impairments listed in the Social Security Regulations, or that loss of musculoskeletal function had been demonstrated. Tr. 185, 187.  Nevertheless, he felt that medical treatment had been only temporarily helpful in mitigating her symptoms, and that her medical problems were "progressively worsening." Tr. 188.  On the other hand, Dr. Stier also completed a medical source statement of ability to do work-related physical activities, in which he found plaintiff able to lift and/or carry 10 pounds occasionally and less than 10 pounds frequently, stand and/or walk at least 2 hours in an 8-hour workday, and sit less than 6 hours in an 8-hour workday. Tr. 191-92.  He also deemed her to be unlimited in her ability to push and/or pull, and to be able to climb, balance, stoop, kneel, crouch and crawl occasionally. Tr. 192.

B.    The ALJ Properly Found that the Medical Evidence in the Record Did Not Support Dr. Kirkham's Opinion

Plaintiff next argues the ALJ improperly stated there was no medical confirmation in the record of any impairment so severe as to preclude all work activity prior to October 2002 (Tr. 19), asserting that this statement is contrary to Dr. Kirkhamn's April 2003 opinion.  As discussed above, however, Dr. Kirkham's April 2003 opinion that plaintiff is disabled and unable to work is not unchallenged in the record.  Indeed, although some of the medical sources in the record felt that an MRI was needed to further evaluate and treat plaintiff, none of them opined that she would be unable to work.  While Dr. Bagby indicated an MRI was needed before he could answer any questions concerning plaintiff's specific work-related functional capacity, his examination of plaintiff occurred prior to the first ALJ's decision, which, as discussed above, properly has not been re-opened.  In any event, Dr. Bagby gave no indication that plaintiff would not be able to work, and his examination findings themselves were fairly benign.

Dr. Kirkham's own diagnostic and treatment notes, furthermore, do not support his opinion that plaintiff was disabled prior to October 2002.  In October 2000, while plaintiff had paraspinal spasm and

straight leg raising pain on the right, she had no asymmetry of deep tendon reflexes, sensation, or strength. Tr. 167.  He diagnosed her with sciatic neuritis, feeling that an MRI was required to effectively treat her. Id. In February 2001, plaintiff had "some discomfort" in her right hip and groin, and straight leg raising pain. Tr. 170.  Again, however, she had no deep tendon reflex, sensation, or muscle strength assymetry, no muscle atrophy, and good sensation in her lower extremities. Id.  Dr. Kirkham diagnosed plaintiff with "[t]enosynovitis/osteoarthritis of the right hip." Id.  In March 2001, he noted that the only medication she was taking was aspirin. Tr. 172.  Her examination was unremarkable. Id.

In March 2002, plaintiff reported that while she had previously had pain on her right side, she now had pain on her left side. Tr. 226.  She had some straight leg raising pain, but it did not cause back pain. Id. Her range of motion was "fairly reasonable." Id.  Dr. Kirkham diagnosed her with questionable bursitis. Id. In May 2002, plaintiff reported that she seemed to be getting "reasonable relief" from Lodine, which she took "more or less on a regular basis." Tr. 229.  On examination this time, she had no straight leg raising pain on the left, but pain was present "slightly on the right with some discomfort into the right buttock." Id. She had no paraspinal spasm or spinal tenderness, and had good circulation in her lower extremities. Id.  Dr. Kirkham diagnosed her with lumbosacral sprain. Id.

In early September 2002, plaintiff reported "some sensitivity" in her lower lumbar regain, and had paraspinal spasm from the mid to low lumbar area. Tr. 249.  She also had straight leg raising pain on the right, but no asymmetry of deep tendon reflexes, sensation, or strength. Id.  Dr. Kirkham again diagnosed her with lumbosacral sprain. Id.  His examination of plaintiff in mid-September 2002, produced essentially the same findings. Tr. 250.  Even as of October 1, 2002, Dr. Kirkham noted that while x-rays of her spine "showed some angular deformity," there was "no significant joint space narrowing, making it somewhat unlikely a disk problem." Tr. 247.  On examination, plaintiff once more had "straight leg raising pain but no asymmetry of deep tendon reflexes, sensation, or strength." Id.  She also had pain when lifting each leg, and Dr. Kirkham diagnosed her with sciatica and "nerve root irritation." Id.

Plaintiff further argues the ALJ improperly concluded that Dr. Kirkham's April 2003 opinion and his prior physical evaluation reports were consistent with a finding that she was able to perform sedentary work prior to October 2002. Tr. 22.  The ALJ, however, did not conclude that Dr. Kirkham's April 2003 opinion was consistent with such a finding.  Rather, as discussed above, the ALJ discredited that opinion as being

1   not supported by the medical evidence in the record.  With respect to the physical evaluation reports Dr.

2   Kirkham completed, as discussed below, the ALJ properly found that they were not inconsistent with a

3   finding that plaintiff was capable of performing sedentary work. Id.

4          In November 2000, Dr. Kirkham completed a state physical evaluation form, in which he found that

5   plaintiff had a marked impairment (defined as a "[v]ery significant interference with the ability to perform

6   one or more basic work-related activities") due to "severe [right] hip degenerative changes." Tr. 221.  She

7   was deemed capable of performing sedentary work at least half-time in normal day to day work setting. Tr.

8   222.  Dr. Kirkham also opined that plaintiff would be unable to perform at least half-time in a normal day to

9   day work setting for a period of thirty weeks. Id.  He provided the same opinion in another state physical

10  evaluation form he completed in November 2001. Tr. 224.

11         To be disabled, however, plaintiff must be able to show she is unable "to engage in any substantial

12  gainful activity by reason of any medically determinable physical or mental impairment which can be

13  expected to result in death or which has lasted or can be expected to last for a continuous period of not less

14  than 12 months." 42 U.S.C. § 423(d)(1)(A).  As such, the two physical evaluation forms that Dr. Kirkham

15  completed (each of which, completed a year apart, indicated an inability to perform at least half-time work

16  in a normal day to day work setting for a period of only thirty weeks) do not show plaintiff to be unable to

17  perform at the sedentary level sufficiently long enough for her to be deemed disabled.

18         C.      Plaintiff's Other Arguments

19         Plaintiff also argues that although the ALJ discusses the examinations of Dr. Van Gerpen and Dr.

20  Bagby for the proposition that her examination findings were minimal, the ALJ improperly left out the fact

21  both physicians stated that an MRI was necessary for them to complete her clinical picture.  The issue of

22  Dr. Bagby's findings already have been dealt with, as discussed above.  For the same reasons, the findings

23  of Dr. Van Gerpen also do not establish plaintiff was disabled during the relevant time period.  Dr. Van

24  Gerpen, furthermore, never stated he required an MRI to determine the nature and extent of plaintiff's

25  work-related functional capacities, but only that "at some point" she may need to have one performed for

26  purposes of her treatment and care.

27         Lastly, plaintiff argues the ALJ erred in citing to the following evidence in the record to discredit Dr.

28  Kirkham's April 2003 opinion: (1) a 1993 primary care physician note for the proposition that plaintiff had

1    no serious health care problems; and (2) the fact that plaintiff had a substantial gap form April 1993 to the

2    time of her consultation with Dr. Van Gerpen in April 1998. Tr. 20.  Plaintiff asserts such evidence is

3    irrelevant to the issue of her medical condition during the relevant time period.  The undersigned agrees.

4    Nevertheless, as discussed above, the ALJ provided more than sufficient reasons for discrediting the April

5    2003 opinion of Dr. Kirkham.

6    IV.     The ALJ Did Not Fail to Properly Develop the Record

7           Plaintiff argues the ALJ failed to properly develop the record by not ordering an MRI of plaintiff's

8    lumbar spine earlier than October 2002.  An ALJ's duty to further develop the record "is triggered only

9    when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the

10   evidence." Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001).  As discussed above, although there are

11   medical sources in the record who recommended plaintiff undergo a lumbar spine MRI to further assess her

12   condition, they did so primarily for the purpose of treating plaintiff.  None of them, except for Dr. Van

13   Gerpen (whose opinion already has been dealt with, also as discussed above), indicated that such testing

14   was necessary to properly evaluate plaintiff for disability purposes prior to October 2002.  Indeed, as of July

15   2002, Dr. Stier admitted chances were "good" that an MRI would find "no significant abnormalities." Tr.

16   186.  Thus, there was no substantial reason for the ALJ to have believed (even if it can be said that she was

17   involved in this matter prior to October 2002, a finding which the undersigned does not make here) that one

18   should have been ordered.

19   V.      The ALJ Properly Assessed Plaintiff's Credibility

20          Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

21   639, 642 (9th Cir. 1982).  The court should not "second-guess" this credibility determination.  Allen, 749

22   F.2d at 580.  In addition, the court may not reverse a credibility determination where that determination is

23   based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

24   claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long

25   as that determination is supported by substantial evidence.  Tonapetyan, 242 F.3d at 1148.

26          To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

27   disbelief."  Lester, 81 F.3d at 834 (citation omitted).  The ALJ "must identify what testimony is not credible

28   and what evidence undermines the claimant's complaints."  Lester, 81 F.3d at 834; Dodrill v. Shalala, 12

F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

The ALJ discounted plaintiff's credibility in part for the following reason:

> The claimant testified to severe limitations including inability to walk, stand, sit, or engage in any physical activity on a consistent basis since the alleged onset date, but these are not supported by the objective medical evidence. . . . There is no substantial evidence to support a finding of severe nonexertional pain which would have significantly diminished the claimant's ability to focus, and she was apparently able to watch television, read, or do similar activities which required concentration.

Tr. 21.  A finding that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998).  As discussed above, the ALJ did not err in finding there was no medical evidence in the record of any impairment severe enough to preclude plaintiff from doing all work activity.

Plaintiff argues, however, that the ALJ's finding in this regard penalizes her for a lack of medical documentation due to lack of access to medical care.  While plaintiff's financial circumstances may have prevented her from obtaining all of the medical care she needed or desired, the record does contain reports and examination notes from a variety of medical sources.  In addition, the ALJ can only rely on the medical evidence that is in the record before him.  That evidence simply did not support plaintiff's allegation that she is precluded from all work activity.  Plaintiff also argues the ALJ's credibility finding is erroneous, because the prior ALJ failed to properly develop the record.  Again, the issue of the prior ALJ's failure to properly develop the record already has been dealt with as lacking merit.

The ALJ also discounted plaintiff's credibility in part for the following reason:

> I note that Exhibit B14F documents a foot injury which occurred while the claimant was carrying a heavy item while camping at the Oregon coast in April 2002.  She was apparently pretty active during that time (indeed, maybe her activities led to her lumbar disorder).  Although these isolated

> reports are only indicators of the claimant's actual functional abilities, it does appear that she was capable of participating in affairs and activities which interested her and which she wanted to be involved in. Such activities, while not directly in correlation with work duties, do indicate a capacity to engage in exertional activities consistent with assessed abilities

Tr. 21. To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if he or she "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. The claimant, however, need not be "utterly incapacitated" to be eligible for disability benefits, and "many home activities may not be easily transferable to a work environment." Id. Plaintiff argues the ALJ's referral to her April 2002 camping trip does not support his conclusion that she had an active lifestyle inconsistent with a claim of disability. It is true that plaintiff's camping trip constitutes only one event. Tr. 228. That event, however, does indicate plaintiff may have been able to lift and/or carry significantly more weight than had been previously claimed. For example, in March 1998, she told Dr. Van Gerpen that she could not carry anything heavier than 10 pounds. Tr. 108. Dr. Fuller felt her stated maximum carrying capacity of less than five pounds was "not consistent" with the medical evidence in the record. Tr. 182.

Other evidence in the record indicated a greater capacity on plaintiff's part to be active as well. Thus, Dr. Van Gerpen noted that she was "able to participate in a variety of activities." Tr. 108. In August 1999, plaintiff told Dr. Bagby that she could walk fourteen blocks, although a year earlier she had stated her limit was only ten blocks. Tr. 108, 112. In October 2002, she also reported being involved in "artistic endeavors, including painting and drawing." Tr. 236.

The final reason the ALJ gave for discounting plaintiff's credibility was as follows:

> Regarding her coronary disorders, I note that the claimant is a smoker and has been advised to quit but continues to smoke. Given her orthopedic and cardiac history this is obviously contravention of medical advice. (Exhibit B6F:1, B2F:2, B4F:5).

Tr. 21. Failure to assert a good reason for not seeking, or following a prescribed course of, treatment, or a finding that a proffered reason is not believable, also "can cast doubt on the sincerity of the claimant's pain testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). If the claimant provides evidence of a good reason for not taking medication, however, her symptom testimony cannot be rejected because she failed to do so. Smolen, 80 F.3d at 1284. Plaintiff argues that her physicians' "advice" does not constitute medical treatment. The undersigned finds this argument to be without merit. Physicians often recommend to their

1  patients that they make changes in their lifestyles, including cessation of smoking.  Such medical "advice,"

2  furthermore, is often an integral part of the overall treatment plan.

3  VI.    The Hypothetical Question the ALJ Posed to the Vocational Expert Was Improper

4          If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

5  process the ALJ must show there are a significant number of jobs in the national economy the claimant is

6  able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e).  The ALJ

7  can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-

8  Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157,

9  1162 (9th Cir. 2000).

10          An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

11  posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

12  1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

13  medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

14  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by

15  the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that

16  description those limitations he finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)

17  (because ALJ included all limitations that he found to exist, and those findings were supported by

18  substantial evidence, ALJ did not err in omitting other limitations claimant failed to prove).

19          The ALJ posed the following hypothetical question to the vocational expert:

20          Now, first of all, I'd like you to presume the following . . . limitation of lifting 10 pounds
            maximum, stand and walk -- let me make sure I get this right. This is B-10F
21          ["Interrogatories to Medical Advisor," provided by Dr. Stier].  Let me look it up, pages
            8 through 11; 10 pounds occasionally, standing and walking three hours in an eight-hour
22          day . . . combined, stand and walk combined; sitting six hours total in a day . . . no
            crouching, crawling or stooping and I also want to impose an additional limitation of an
23          ability to change position from sit to stand every 30 to 40 minutes.

24  Tr. 401.  Plaintiff argues the above hypothetical question did not include all her limitations.  Specifically,

25  plaintiff asserts that while the ALJ cited to Dr. Stier's report as support for the hypothetical question, the

26  description of plaintiff's ability to sit contained in the hypothetical question did not match the description set

27  forth in Dr. Stier's report.  The undersigned agrees.

28          As can be seen above, the hypothetical question the ALJ posed to the vocational expert states that

REPORT AND RECOMMENDATION
Page - 18

1  plaintiff could sit for a total of six hours in a day.  It also appears that the ALJ relied on the report of Dr.

2  Stier in framing that hypothetical question.  In his report, however, Dr. Stier stated that plaintiff would be

3  able sit for <u>less</u> than six hours in an eight-hour workday. Tr. 192.  While there is other medical evidence in

4  the record that indicated plaintiff was capable of sitting for about six hours total in an eight-hour workday

5  (Tr. 122, 179), the ALJ did not mention that evidence in framing the hypothetical question.  Accordingly,

6  the undersigned cannot uphold the hypothetical question as posed to the vocational expert.

7        Plaintiff's other bases for challenging the ALJ's hypothetical question, however, are without merit.

8  Plaintiff argues that because Dr. Stier indicated that his assessment of a number of her physical functional

9  capacities was based on her own self-reports, this suggests he did not review the records of Dr. Kirkham.

10  Elsewhere in his report though, Dr. Stier states that he read the "medical data" pertaining to plaintiff that

11  was furnished to him. Tr. 185.  There is no indication in the record that the medical data Dr. Stier reviewed

12  did not contained the records of Dr. Kirkham that were available at that time.

13        Plaintiff also argues the ALJ provided no explanation as to why he did not include Dr. Kirkham's

14  limitation in the hypothetical question that she could do no more than half-time work.  The ALJ, however,

15  did not have to do so.  This is because, as discussed above, the ALJ properly discredited the opinion of Dr.

16  Kirkham's that plaintiff was disabled and unable to work prior to October 9, 2002.

17  VII.   <u>This Matter Should Be Remanded For Further Administrative Proceedings</u>

18        The court may remand a case "either for additional evidence and findings or to award benefits."

19  <u>Smolen</u>, 80 F.3d at 1292.  Benefits may be awarded where "the record has been fully developed" and

20  "further administrative proceedings would serve no useful purpose." <u>Id.</u>; <u>Holohan v. Massanari</u>, 246 F.3d

21  1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

22        (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
         evidence, (2) there are no outstanding issues that must be resolved before a
23       determination of disability can be made, and (3) it is clear from the record that the ALJ
         would be required to find the claimant disabled ere such evidence credited.
24
25  <u>Smolen</u>, 80 F.3d 1273 at 1292; <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because

26  there still remains an issue regarding plaintiff's ability to do other jobs existing in significant numbers in the

27  national economy prior to October 9, 2002, this case should be remanded to the Commissioner for further

28  administrative proceedings.

CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **April 15, 2005**, as noted in the caption.

DATED this 17th day of March, 2005.


/s/ Karen L. Strombom
Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 20